UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Clarence Stephens, Jr., *et al.*,

    Plaintiffs,

        v.

Hamilton County Jobs and
Family Services, *et al.*,

    Defendants.

Case No. 1:12cv603

Judge Michael R. Barrett

## OPINION & ORDER

This matter is before the Court upon Defendant Eryn Hunt's Motion for Summary Judgment. (Doc. 50). Plaintiffs filed a Response (Doc.51) and Defendant filed a Reply (Doc. 52).

### I. BACKGROUND

Plaintiffs Clarence and Kimberly Stephens brought this action in their individual capacity and as next friends of their natural children, O.S. and C.S. (Doc. 25). Defendant Eryn Hunt is a social worker employed by Hamilton County Ohio's Department of Jobs and Family Services ("HCJFS").

During the early morning hours of August 8, 2010, Plaintiffs had a domestic dispute. (Doc. 41, Juvenile Court Record p. 624-25) Kimberly called the police. (Id. at 626-27). The responding police officer arrested both parents for domestic violence. (Doc. 44, Kimberly Stephens Depo. at 66). Kimberly told the officer she did not have anyone to watch the children, but later called her father, Lucius Lamar, who came to the

house. (Id.; Doc. 41, p. 654).[1]

The police officer reported the incident to the Hamilton County Department of Job and Family Services. (Doc. 41, p. 697). Later that morning, Eryn Hunt was assigned to Plaintiffs' case. (Doc. 41, p 332, 355). Plaintiffs' case file had been screened by other employees and was classified as Priority 2, which meant that Hunt was required to talk with one parent and to at least make two attempts to see the children within 24 hours. (Doc. 50-1, Erin Eckert Affidavit, ¶¶ 6, 10).

Around 10:00 a.m., Hunt went to the Hamilton County Justice Center to interview Kimberly. Hunt spoke with Kimberly for 40-60 minutes. (Doc. 41, p. 595). Hunt explained to Kimberly that the prior domestic violence charges filed by her mother, Dell Wyde, against Lucius Lamar, made her father an inappropriate caregiver for the children, and another relative would have to be found to watch the children. (Doc. 45, Eryn Hunt Depo. at 51, 54). Kimberly identified Wyde as the only potential alternative caregiver. (Hunt Depo. at 46). Kimberly suggested to Hunt that she talk to her husband for other possible care givers. (Doc. 41, p 662).

Hunt was unable to meet with Clarence because he had been taken from the Justice Center to a dialysis center in Forest Park. (Doc. 43, Clarence Stephens Depo. at 5; Doc. 41 p. 576-77). Clarence did not return to the Justice Center until 2:15 p.m. or 3:00 p.m. (Clarence Stephens Depo. at 5-6).

When Hunt returned to her office, Hunt checked to see if Wyde was an appropriate caregiver with no criminal history, and then contacted Wyde. (Doc. 41, p. 576-77)

---

[1] Plaintiffs' child O.S. has special needs. Kimberly has explained that as a result, he "needs constant supervision . . . he will literally run into the street if you're not holding his hand. We just always has [sic] to have an eye on him. He has of course a seizure disorder. He is developmentally delayed. He's non-speaking." (Doc. 41, p, 656).

2

Wyde told Hunt she had no way to get to the Stephens' residence because Lamar had taken the car. (Hunt Depo. at 59). Hunt told Wyde that she would transport her to the Stephens' residence and would call her again in the afternoon. (Id. at 60). Hunt then drove to the Stephens residence for the required interview with the children, arriving at 2:30 or 3:00 p.m. (Doc. 41, p 333, 555). Lamar, who was 77 years old, was caring for the Stephens children when Hunt arrived. (Hunt Depo. at 61). Hunt spoke with Lamar who said that Wyde has cancer and she was currently at radiation treatment. (Id. at 61). Lamar told Hunt that Wyde would not be able to care for the children, explaining that there were times that he had to change her bed pan himself. (Id.)

While still at the Stephens' home, Hunt tried calling Wyde on her cellphone at 3:15 p.m., but no one answered. (Hunt Depo. at 64; Doc. 45-5, PageID # 1375). After contacting her supervisor, Erin Eckert, at 3:17 and 3:22, Hunt contacted the assistant prosecutor who was on duty at 3:22 p.m. and spoke with him for eight minutes. (Hunt Depo. 96-99, Doc 45-5, PageID # 1375; Eckert Affidavit, ¶18). Hunt spoke again with her supervisor twice at 3:30 p.m. and at 3:42 p.m. (Hunt Depo. at 96-99, Doc. 45-5, PageID # 1375; Eckert Affidavit, ¶16). Following those telephone calls, Hunt attempted again to contact Wyde without success. (Hunt Depo. at 96-99, Doc. 45-5, PageID # 1375). Hunt then checked her voicemail at 3:47p.m. (Hunt Depo. at 96-99, Doc. 45-5, PageID # 1375).

After the discussion with the prosecutor and her supervisor, Hunt decided to leave the Stephens' children in the care of Lamar if he was willing to care for them even though he had been determined by other HCJFS workers to be inappropriate due to domestic violence charges. (Hunt Depo. at 71). Lamar, however, told Hunt that he had been

3

watching the children since 3:00 a.m. and was too tired, and would not be able to stay another night. (Hunt Depo. at 62).

Because Lamar told Hunt that he could no longer care for the children and because no other caregivers identified by the family were available to care for the children, at 4:01 p.m. Hunt initiated the process to obtain an emergency order to transfer custody of the children to HCJFS. (Hunt Depo. 65, 96-99). Hunt contacted the Juvenile Court and waited for the magistrate on duty to return her call. The return call from Magistrate Charles Milazzo came at 4:15 p.m. (Hunt Depo. 96-99; Doc 45-5, PageID #1376). During the call with Magistrate Milazzo, Hunt testified that no one was able or willing to care for the children. (Hunt Depo. at 67).[2]

A telephone Emergency Order was issued by Magistrate Milazzo finding probable cause to believe that C.S. and O.S. were "in immediate danger from their surroundings and removal is necessary to prevent immediate or threatened physical or emotional harm." Magistrate Milazzo found that: "Parents incarcerated. No Relatives available." (Doc. 50-3, PAGE ID #1523).

Plaintiffs allege that Hunt provided false information to Magistrate Milazzo to obtain the Emergency Order to place O.S. and C.S. in foster care. Plaintiffs bring a claim on behalf of O.S. and C.S against Hunt under 42 U.S.C. § 1983 based on an unreasonable seizure in violation of the Fourth Amendment. This sole claim is brought against Hunt in her individual capacity.

II. **ANALYSIS**

---

[2]Magistrate Milazzo explained that his normal procedure in considering an Emergency Order was to have the HCJFS social worker testify to the facts under oath. (Doc. 50-3, Milazzo Aff., ¶3). However, while the recording device was turned on, the sworn testimony of Eryn Hunt when seeking the emergency order was not recorded. (Doc. 50-2, Murdock Aff., ¶3).

4

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Hunt argues she is entitled to summary judgment on Plaintiffs' Fourth Amendment claim. Inexplicably, Hunt raises several arguments which the Court has already addressed and rejected when ruling on Hunt's Motion for Judgment on the Pleadings. As a consequence, the Court will not address these arguments raised by Hunt again: (1) Hunt is entitled to absolute immunity (See Order, Doc. 33, PAGEID #183-84) ("Therefore, to the extent that Plaintiffs allege that Hunt testified falsely that there was a lack of acceptable relatives or that an emergency situation existed, Hunt is not entitled to absolute immunity.")) (2) this Court does not have jurisdiction over Plaintiffs' claims under the *Rooker-Feldman* doctrine (See Order, Doc. 33, PAGEID #180 ("*Rooker-Feldman* does not apply in this case.")); (3) *res judicata* bars Plaintiffs' claims (See Order, Doc. 33, PAGEID #181) ("The Court finds that *res judicata* is not applicable here.").

Hunt's remaining arguments are: (1) Plaintiffs' claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994); Hunt is entitled to Eleventh Amendment immunity; and (3) Hunt is entitled to qualified immunity.

5

### B. Qualified Immunity

In ruling on Hunt's Motion for Judgment on the Pleadings, this Court ruled that based on the allegations in the Second Amended Complaint, Hunt was not entitled to qualified immunity. Hunt raises the defense again. *Accord English v. Dyke*, 23 F.3d 1086, 1089 (6th Cir. 1994) (explaining that qualified immunity defense can be re-raised at various stages of the litigation).

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Sixth Circuit has explained:

> To determine whether a government official is entitled to qualified immunity, we consider the two-part test described in *Saucier v. Katz*, which asks whether "a constitutional right would have been violated on the facts alleged" and, if so, whether the right was "clearly established." 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We are free to address the second question first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

*Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014) (footnote omitted). If this Court "determines that the plaintiff's evidence would reasonably support a jury's finding that the defendant violated a clearly established right, the court must deny summary judgment." *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 609 (6th Cir. 2015).

This Court has already concluded that that it was clearly established in 2011 that Fourth Amendment warrant requirements applied to the removal of children from their homes by social workers. (Doc. 33, PAGEID # 185). *See also Kovacic v. Cuyahoga*

6

*Cnty. Dep't of Children & Family Servs.,* 724 F.3d 687, 699 (6th Cir. 2013) (explaining that as of 2002, "it was clearly established that Fourth Amendment warrant requirements, including the exigent-circumstances exception, apply to the removal of children from their homes by social workers."). Therefore, this Court must determine whether there was a violation of a constitutional right.

Plaintiffs' constitutional claim under Section 1983 centers on the allegation that Hunt presented false information to Magistrate Milazzo.

As this Court explained in its ruling on Hunt's Motion for Judgment on the Pleadings, Plaintiffs' claim is to be analyzed under the standards for probable cause for a warrant articulated in *Franks v. Delaware*, 438 U.S. 154 (1978). *Accord Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990) (where Fourth Amendment claim was based on allegation that child care workers knew that any allegations of child sexual abuse were false "a plaintiff must make a substantial showing of deliberate falsehood or reckless disregard for truth, such that would be needed to challenge the presumed validity of an affidavit supporting a search warrant under *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978)."). As this Court previously ruled, the applicable test is:

> To overcome an officer's entitlement to qualified immunity, however, a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause.

*Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003); *see also Snell*, 920 F.2d at 698 ("Likewise, in a § 1983 claim for judicial deception there must be 'a specific affirmative showing of dishonesty by the applicant,' *i.e.*, knowledge of a plaintiff's innocence or that a

witness was lying. Equally important, a plaintiff must establish that, but for the dishonesty, the challenged action would not have occurred.") (citation omitted).

To show that Hunt stated a deliberate falsehood or reckless disregard for truth, Plaintiffs have relied on the Declaration of Kimberly Stephens, which is attached to Plaintiffs' Response to Hunt's Motion for Summary Judgment. (Doc. 51-1). In her Declaration, Kimberly states that when she was arrested, she called Lamar and he came to the house. (Id., ¶ 5). Kimberly states:

> I asked Mr. Lamar to stay with the kids until my sister, Ms. Pam Bryant, got off work and could get to my house. Then Mr. Lamar was supposed to pick up my Mom, Ms. Dell Wyde, and bring her over to watch the kids so Ms. Bryant could get home to her family.

(Id., ¶ 6). The police officer who responded to the scene provided this information to the Hamilton County Department of Job and Family Services, and the information was contained in a report which was reviewed by Hunt's supervisor, Eckert. (Eckert Aff., ¶¶ 6-7; Ex. 1) ("MGF is going to stay at residence until maternal aunt, Pam Bryant responds to the home to care for children."). Kimberly states that she told Hunt this information while at the jail. (Kimberly Stephens Aff., ¶ 7).

Kimberly also states in her Declaration that Wyde told her that she did not talk to Hunt at any time on August 8, 2011. (Id., ¶ 8). Kimberly states that Lamar told her that he did not refuse to stay and watch the children, but he did tell Hunt that he was tired. (Id., ¶ 9). Unfortunately, Lamar died on November 18, 2014 (Kimberly Stephens Depo. at 10); and Wyde died on April 29, 2014. (Kimberly Stephens Depo. at 15). Neither Lamar or Wyde testified about these events before they died.

The Court finds that these statements by Lamar and Wyde are inadmissible hearsay. *Accord Estate of Jennifer Tierney v. Shellberg*, 2011 WL 4543810, *7-10

8

(S.D.Ohio). "A party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of fact." *Sperle v. Michigan Department of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002). Therefore, this Court will not consider Kimberly's statements about what Lamar and Wyde told her in deciding Hunt's Motion for Summary Judgment.

      Plaintiffs have not made a substantial showing that Hunt stated a deliberate falsehood or showed reckless disregard for the truth. Hunt met with Kimberly to determine if there was an acceptable caregiver for the children. Hunt has testified that Kimberly told her that Wyde was the only relative who could care for the children. However, during the time Hunt was at the Stephens' residence, Wyde was not available by telephone. In addition, Hunt has testified that Lamar informed her that he could no

longer care for the children.[3] Without evidence that Hunt stated a deliberate falsehood or showed a reckless disregard for the truth, Plaintiffs cannot establish a Fourth Amendment violation. Accordingly, Hunt is entitled to qualified immunity on Plaintiffs' Section 1983 claim.

## III. CONCLUSION

Based on the foregoing, Defendant Eryn Hunt's Motion for Summary Judgment. (Doc. 50) is **GRANTED**. This matter is **CLOSED and TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED.**

               */s/ Michael R. Barrett*
               Michael R. Barrett
               United States District Judge

---

[3] This is consistent with Kimberly's own statements during a hearing on August 12, 2011 before Magistrate Karen Falter:

> THE MOTHER: Honestly, everybody thinks there's a relative, but there isn't because if we had a relative, they would be sitting here. We wouldn't be in this situation if we had a relative.
>
> THE COURT: I see what you're saying.
>
> THE MOTHER: I'm not ruling out anyone. I mean - -
>
> THE COURT: Okay.
>
> MR. HIGGS: Your Honor, we want to make sure that Lamar - - Mr. Lamar, where the child was initially placed, that he's not one of the caregivers.
>
> THE COURT: Or the supervisor as they transition.
>
> MR. KATHMAN: We understand that concern, he's not able or interested.
>
> THE MOTHER: Right. That was just an emergency situation. That is not a sitter for us.

(Doc. 41, p. 462).